### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PROVIDENT LIFE & ACCIDENT | ) | 3:19-CV-1325 (SVN) |
| INSURANCE COMPANY, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRADLEY D. MCKINNEY, | ) | September 9, 2022 |
| *Defendant*. | ) | |

### RULING AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

This is a dispute under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Defendant and counterclaim Plaintiff Bradley McKinney applied for and obtained a disability insurance policy with Plaintiff and counterclaim Defendant, Provident Life Accident & Insurance Company ("Provident Life"). McKinney subsequently filed a claim for disability benefits under the policy, but Provident Life rejected his claim on the ground that McKinney made material misrepresentations in his application for the policy. Provident Life initiated the present ERISA action seeking rescission of the insurance policy, and McKinney counterclaimed seeking an order directing Provident Life to pay him all benefits due under the policy.

The parties have now filed cross-motions for summary judgment, ECF Nos. 51, 53, and they further request that the Court resolve any factual disputes according to the stipulated administrative record, ECF No. 62. Both motions for summary judgment present the identical question of whether McKinney made material misrepresentations in his application for the insurance policy.

For the foregoing reasons, the Court concludes that there is no genuine dispute of material fact that McKinney made material misrepresentations when applying for the insurance policy. Accordingly, Provident Life's motion for summary judgment, ECF No. 53, is GRANTED and McKinney's motion for summary judgment, ECF No. 51, is DENIED.

## I.    FACTUAL BACKGROUND

The parties agree on the following basic facts. McKinney's employer, Anderson Tax LLC, maintained a Supplemental Individual Disability Insurance Plan. Def.'s Local Rule ("LR") 56(a)2 Statement ("St."), ECF No. 58 ¶ 1. Relevant here, the plan permitted eligible employees to apply for a combination of three types of coverages: long-term disability benefits, which Defendant refers to as "Guaranteed Standard Issue," and which the Court will refer to as "basic disability benefits"; catastrophic disability coverage ("catastrophic coverage"); and an option to convert the basic disability benefits into long-term care coverage ("long-term care coverage"). *Id.* ¶ 2. An employee could apply for any individual or combination of these coverages on the same form.

In June of 2017, McKinney applied for supplemental insurance through the plan. Pl.'s LR 56(a)2 St., ECF No. 57 ¶ 1. In completing the application, McKinney answered various questions about his medical history and agreed that his answers were "true and complete and correctly recorded to the best of [his] knowledge and belief." Def.'s LR 56(a)2 St., ECF No. 58 ¶ 6. In September of that year, Provident Life issued him an insurance policy providing all three coverages. Pl.'s LR 56(a)2 St., ECF No. 57 ¶ 7. The policy provided that "[o]missions and misstatements in the application could cause an otherwise valid claim to be denied or [the policy] to be rescinded." Def.'s LR 56(a)2 St., ECF No. 58 ¶ 8.

In August of 2018, McKinney filed a claim for basic disability benefits related to a neurocognitive disorder. Pl.'s LR 56(a)1 St., ECF No. 53-2 ¶¶ 12–13. His claim form stated that

he first began experiencing symptoms of "confusion, severe fatigue, loss of memory, challenges with thinking, analyzing, [and] lack of concentration" in February of 2016. *Id.* ¶¶ 13–14. Provident Life's claims specialist investigated McKinney's claim, obtained certain medical records, and consulted with the underwriters. *Id.* ¶¶ 23–35. Thereafter, Provident Life denied McKinney's claim and notified him that it was rescinding its policy on the ground that McKinney had materially misrepresented his medical history when applying for the insurance. *Id.* ¶¶ 40–41. McKinney filed an appeal, and, after obtaining more of his medical records, Provident Life concluded that it had properly rescinded the policy. *Id.* ¶¶ 47, 68.

Specifically, Provident Life reasoned that McKinney untruthfully represented his medical history on the application for insurance coverage in two ways. First, in answering questions 6 and 8, he represented that he had not received diagnosis or treatment from a physician for memory loss, confusion, or speech disruption in the five years preceding his application. Administrative Record ("AR") at 73, 1506–07. Second, in answering question 3(a), he represented that he had not missed one or more days of work or been admitted to a medical facility due to sickness or injury in the 180 days preceding his application. AR at 73, 1753. Upon reviewing McKinney's medical records, Provident Life concluded that his answers to those questions were untruthful and that its denial of his claim and rescission of his policy were proper. AR at 1754.

Soon thereafter, Provident Life filed the complaint in the present action, seeking the equitable relief of rescission of the insurance policy under ERISA, 29 U.S.C. § 1132(a)(3). Compl., ECF No. 1 ¶ 47. McKinney filed a counterclaim under § 1132(a)(1)(B), claiming that Provident Life wrongfully denied benefits owed to him under the policy and seeking an order directing Provident Life to pay him all benefits due under the policy. Counterclaim, ECF No. 11

¶¶ 13–14.  The parties filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.[1]  ECF Nos. 51, 53.

## II.  LEGAL STANDARD

### A.  Fed. R. Civ. P. 56(a)

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  With respect to materiality, a fact is "material" only if a dispute over it "might affect the outcome of the suit under the governing law[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  While the movant bears an "initial responsibility of informing the district court of the basis for its motion," a non-movant who bears the ultimate burden of proof must "designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (internal quotation marks omitted).  Thus, summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.

---

[1] Following oral argument on the motions, the parties filed ECF No. 62, jointly stipulating that the record in this case is limited to the Administrative Record, ECF No. 49.  The filings also requested that, to the extent the Court finds any genuine disputes of material fact, the Court resolve those disputes along with the present motions in the form of a bench trial on the papers pursuant to Federal Rule of Civil Procedure 52.  *See Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003) (holding that a "bench trial on the papers with the District Court acting as the finder of fact" was "entirely proper" in an ERISA case); *Zurndorfer v. Unum Life Ins. Co. of Am.*, 543 F. Supp. 2d 242, 254–55 (S.D.N.Y. 2008) (noting that, in ERISA cases, "courts in this circuit have split on how to treat a motion for judgment on the administrative record when . . . a motion for summary judgment has not yet been decided," and explaining that "some courts treat such motions as motions for summary judgment under Rule 56, while others decide them under Rule 52(a) . . . as bench trials on the papers" (citations and internal quotation marks omitted)).  As demonstrated below, the Court need not consider the parties' cross-motions as a bench trial on the papers pursuant to Rule 52 because the Court concludes there is no genuine dispute of material fact.

B.  ERISA

"ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans . . . and to protect contractually defined benefits[.]"  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (citations and internal quotation marks omitted). ERISA provides "a panoply of remedial devices" for benefit plan participants, such as a private civil action to enforce the participant's rights and recover benefits to due to him under the plan. *Id.* at 108 (citation and internal quotation marks omitted); 29 U.S.C. § 1132(a)(1)(B).  In addition, ERISA permits plan fiduciaries to pursue equitable relief to enforce the terms of a plan.  *See id.* § 1132(a)(3) (providing that a civil action may be brought "by a . . . fiduciary . . . to obtain . . . appropriate equitable relief . . . to enforce any provisions of . . . the terms of the plan").

Although the Second Circuit has not squarely addressed this issue, the parties do not dispute that a plan fiduciary may obtain "equitable rescission of an ERISA-governed insurance policy that is procured through the material misstatements or omissions of the insured."  *Shipley v. Ark. Blue Cross & Blue Shield*, 333 F.3d 898, 902 (8th Cir. 2003).  An ERISA plan fiduciary's right to obtain equitable rescission is well grounded in federal common law, *id.*, and the text of § 1132(a)(3), *see Guardian Life Ins. Co. of Am. v. Claydon*, 855 F. Supp. 43, 44 (D. Conn. 1994) (holding that § 1132(a)(3) permits "actions by fiduciaries to obtain equitable relief to redress violations of the terms of a plan or to enforce the terms of a plan").  Here, the parties agree that the Provident Life's decision to rescind the policy is not entitled to deference and the Court should review the decision, including attendant factual issues, pursuant to a *de novo* standard.  ECF No. 52 at 10; ECF No. 53-1 at 18; *Muller*, 341 F.3d at 124.

C.  Recission Due to Material Misrepresentation

Under the federal common law that has developed pursuant to ERISA,[2] an insurer can rescind a policy where the insured knowingly made a material misrepresentation in an application for an ERISA-governed insurance policy.  *Shipley*, 333 F.3d at 903; *Guardian Life Ins. Co. of Am.*, 855 F. Supp. at 44.  *See also Bristol v. Com. Union Life Ins. Co. of Am.*, 211 Conn. 622, 628 (1989).  Thus, Provident Life will be entitled to summary judgment if it demonstrates that there is no genuine dispute that (1) McKinney made a misrepresentation, (2) knowingly, (3) that was material to its decision to issue the insurance policy.  *See Pinette v. Assur. Co. of Am.*, 52 F.3d 407, 409 (2d Cir. 1995) (applying Connecticut law).

Regarding the first element, "[a] misrepresentation is a statement of fact that is untrue or a failure to disclose a fact in response to a specific question."  *Shipley*, 333 F.3d at 903.  *See also Pinette*, 52 F.3d at 409 (defining a "misrepresentation" as an "untrue statement" under Connecticut law).

Regarding the second element, a misrepresentation will permit an insurer to rescind the policy only if it was "untrue and known by the [insured] to be untrue when made[.]"  *State Bank*

---

[2] The parties disagree over whether federal common law or Connecticut law prescribes the rule of law for the rescission of an insurance policy due to a material misrepresentation.  *Compare* ECF No. 52 at 10–12 (McKinney conducting a choice-of-law analysis), *with* ECF No. 56 at 6 (Provident Life contending that federal common law, informed by Connecticut common law to the extent consistent with federal policy, governs the material misrepresentation question).  The majority of ERISA cases considering a plan participant's material misrepresentation appear to rely on federal common law and the statutory authority of § 1132.  *See Provident Life & Acc. Ins. Co. v. McKinney*, No. 3:19-cv-1325, 2021 WL 7264743, at *4 (D. Conn. Sept. 14, 2021) (citing *Shipley*, 333 F.3d at 902, and *Guardian Life Ins. Co. of Am.*, 855 F. Supp. at 44).  However, the Court need not resolve the parties' disagreement on this issue because they agree that the relevant federal common law principles and Connecticut state law principles are virtually indistinguishable with regard to this case.  *See Jackson v. Travelers Ins. Co.*, No. 94 Civ. 5895 (SHS), 1996 WL 350677, at *4 (S.D.N.Y. June 26, 1996) ("[B]ecause the federal courts look to state law in fashioning federal common law . . . there would be no appreciable difference between the application of [state] law and federal common law, at least on the facts of this case."), *aff'd*, 113 F.3d 367 (2d Cir. 1997).  Therefore, federal common law, informed by and consistent with Connecticut state law, shall govern this case.  *See Shipley*, 333 F.3d at 902 (noting that federal common law controlled the ERISA case, but, "[i]n developing federal common law, we may look to state law for guidance to the extent that state law does not conflict with ERISA or its underlying policies"); *Corn v. Protective Life Ins. Co.*, No 3:95-CV-556 (WWE), 1998 WL 51783, at *4 (D. Conn. Feb. 4, 1998) ("Because ERISA is silent as to the effect of an insured's alleged material misrepresentations on an application for health insurance, the Court may turn to state law principles for guidance.").

*& Trust Co. v. Conn. Gen. Life Ins. Co.*, 145 A. 565, 567 (Conn. 1929).   "'Innocent' misrepresentations—those made because of ignorance, mistake, or negligence—are not sufficient grounds for rescission." *Pinette*, 52 F.3d at 409–10.   However, a misrepresentation is not innocent where the insured failed to read the application before signing it, *id.* at 410, or failed to "use reasonable diligence to see that the answers are correct," *Corn*, 1998 WL 51783, at *5.   *See also Pinette*, 52 F.3d at 410 ("an applicant for insurance has the affirmative duty 'to inform himself of the content of the application signed by him, under penalty of being bound by the representations as recorded therein'" (citation omitted)).   In other words, an insurer may obtain rescission of the insurance policy if the insured *unreasonably* believed that his answer was true.   *Shipley*, 333 F.3d at 905; *Middlesex Mut. Assur. Co.*, 218 Conn. at 698 (reasoning that "an insured should not be held responsible for an answer in the application if he was justifiably unaware of its falsity" (citation and internal quotation marks omitted)).

Regarding the third element, "[i]n cases governed by ERISA, misstatements or omissions have been deemed material where knowledge of the true facts would have influenced the insurer's decision to accept the risk or its assessment of the premium amount."   *Shipley*, 333 F.3d at 905. *See also* 6 Couch on Ins. § 82:13 (3d ed.) ("Broadly speaking, the test of materiality is whether the fact or circumstance represented or misrepresented operated to induce the insurer to accept the risk or to accept it at a lower premium."); *Pinette*, 52 F.3d at 411 ("Under Connecticut law, a misrepresentation is material 'when, in the judgment of reasonably careful and intelligent persons, it would so increase the degree or character of the risk of the insurance as to substantially influence its issuance, or substantially affect the rate of premium.'" (citation omitted)).

### III.    DISCUSSION

As noted, Provident Life rejected McKinney's claim for basic disability benefits and subsequent appeal on the ground that he untruthfully represented his medical history on the application for insurance coverage.  Provident Life identified two of McKinney's responses that were allegedly untrue, warranting rescission of the policy.  First, in initially rejecting his claim, Provident Life explained that McKinney untruthfully answered questions 6 and 8, which concerned prior treatment for memory loss, confusion, or speech disruption in the relevant time frame. AR at 73, 1506–07.  Second, in denying McKinney's appeal, Provident Life explained that McKinney also untruthfully answered question 3(a), which concerned time off work due to admission to sickness or injury in the relevant time frame.  *Id.* at 73, 1753.  The Court considers each response in turn.

A.    Questions 6 and 8

*1. Additional Factual Background*

The following additional factual background is relevant to consideration of questions 6 and 8 of McKinney's application for insurance coverage.  In late January and early February of 2016, more than one year before applying for the supplemental insurance, McKinney was suffering from worsening back pain and a mass on his chest.  AR at 329.  His partner noticed that he was increasingly lethargic, eating less, and "speaking nonsensically," so they went to a walk-in clinic on February 8, 2016.  *Id.*  The clinic sent McKinney to Norwalk Hospital by ambulance due to his "altered mental status."  *Id.*

Upon arrival at the hospital on February 9, 2016, the emergency physician reported that McKinney presented "with confusion" and noted that his partner "felt that he has been increasingly confused."  *Id.* at 333; *see also id.* at 331 ("Patient was very altered at time of admission, unable

8

to complete a full logical sentence."). He was admitted to the hospital. *Id.* at 333. Another physician's note from later the same day reported that McKinney's chief complaint was a chest mass, but also noted that he was brought to the hospital "for evaluation of increasing lethargy and altered mental status." *Id.* at 322. After the chest mass was identified as a metastatic cancer mass, he was transferred to Yale New Haven Hospital to initiate chemotherapy treatment. *Id.* at 330. One nurse and one physician at Yale reported "episodes of confusion" and slow speech. *Id.* at 224–25. Another physician noted "[c]ognitive slowing" and suspected that he might have an "HIV associated neurocognitive disorder spectrum disease," consistent with his later diagnosis with neurosyphilis. *Id.* at 233.

In June of 2017, the application for supplemental insurance required McKinney to answer two questions relevant here. The form instructed the applicant to respond to questions 5–8 *if* applying for the catastrophic coverage or the long-term care coverage. *Id.* at 73. Question 6 asked: "Within the last five years, have you been diagnosed or treated for or sought diagnosis or treatment from a physician for memory loss or confusion?" *Id.* Question 8 asked: "Within the last five years, have you been diagnosed or treated for blindness or deafness, or the loss of use of both arms, both legs, or one arm and/or one leg or any amputation, or any disruption of your normal speech function?" *Id.* McKinney answered "no" to both of these questions. *Id.*

In investigating McKinney's subsequent claim for basic disability benefits, Provident Life's claims specialist interviewed McKinney, who stated that he was diagnosed with his disability in February of 2016, which is when he began developing cognition and concentration issues. *Id.* at 206. Provident Life obtained the medical records of his 2016 hospitalization. *Id.* at 1487. The claims specialist consulted an underwriter, Lisa Fagan, who indicated that, if McKinney had answered "yes" to questions 6 and 8 and "provided details of [s]hort term memory loss and

speech issues," she would have removed the catastrophic coverage and long-term care coverage. *Id.* After reviewing the medical records and consulting with Fagan, the claims specialist concluded that McKinney's answers to questions 6 and 8 were untruthful, warranting denial of his claim for benefits and rescission of his policy.

### *2. Discussion*

The Court finds no genuine dispute of fact that McKinney made material misrepresentations in responding to questions 6 and 8 of his application for supplemental insurance coverage. First, there is no dispute that McKinney's answers to those questions were untrue. McKinney's representation that he had not "been diagnosed or treated for or sought diagnosis or treatment from a physician for" memory loss, confusion, or disruption of normal speech function in the preceding five years, AR at 73, clearly contradicted the medical records from his 2016 hospitalization. Specifically, McKinney was sent from the walk-in clinic to the hospital due to his "altered mental status," *id.* at 329, an observation confirmed by the admitting physician's note that he presented "with confusion," as well as McKinney's partner's comment that he had become "increasingly confused." *Id.* at 333. Other hospital notes indicate that McKinney continued to present with "confusion," "slow speech," and "cognitive slowing" during this hospitalization, at one point "unable to complete a full logical sentence." Def.'s LR 56(a)2 St., ECF No. 58 ¶¶ 28–35. Thus, he was certainly treated for confusion and speech disruption within five years of his application for supplemental insurance coverage, rendering his contrary responses to questions 6 and 8 untrue. *See Pinette*, 52 F.3d at 409.

McKinney contends that the "primary condition" for which he was treated during the 2016 hospitalization was cancer related to the mass on his chest, and that his confusion and speech disruption were merely symptoms of that cancer. ECF No. 55 at 5. He further notes that an

ambiguous question in an insurance coverage application is generally "interpreted most strongly against the insurer." *Middlesex Mut. Assur. Co.*, 218 Conn. at 694. However, the questions asked whether McKinney was "diagnosed or treated for or sought diagnosis or treatment from a physician for" confusion, memory loss, or speech disruption during the relevant time frame. AR at 73. This phrasing unambiguously includes the treatment which McKinney sought and ultimately received for his confusion and speech disruption, irrespective of whether those were themselves the chief complaints or mere symptoms of a different complaint.

This case is readily distinguishable from *Cote*, in which the insurance application asked whether the applicant had been diagnosed with particular "*disorders*." *Cote v. United of Omaha Life Ins. Co.*, No. 3:14-cv-1644-VAB, 2017 WL 1013296, at *5 (D. Conn. Mar. 15, 2017) (emphasis added). There, the court concluded that the insured had answered the question truthfully when omitting certain medical conditions because the insured's doctors had explained that those were "considered symptoms of disorders rather than disorders themselves." *Id.* Given the much broader nature of questions 6 and 8 here, McKinney fails to demonstrate a reasonable alternative construction of those questions that would lead a lay person to believe they excluded treatment for confusion, memory loss, or speech disruption as a symptom of some larger medical condition. *See Middlesex Mut. Assur. Co.*, 218 Conn. at 694 (explaining that the court "must construe the question as a lay person would understand it"); *Jackson*, 113 F.3d at 370 (finding no ambiguity because the question "does not call for the applicant to interpret technical medical jargon but rather is written in clear, everyday language that a layperson should be able to understand and furnish truthful, accurate and complete responses to" (citation omitted)).

Turning to the second element, as noted, an untrue statement on an application for insurance coverage must be made knowingly in order to warrant rescission of an insurance policy.

*Id.* at 691.  McKinney contends, however, that any misrepresentations in his responses to questions 6 and 8 were innocent because "he was not aware that he had been diagnosed with or treated for memory loss, confusion or speech issues."  ECF No. 52 at 21; *see also* AR at 1619 (McKinney's argument, on appeal from Provident Life's denial of his benefits claim, that he was not aware of the reports of cognitive or speech issues in the medical records).

The Court concludes that any ignorance on McKinney's part that he had been treated for confusion and speech disruption during his 2016 hospitalization was not innocent.  As noted, a misrepresentation is innocent when "the applicant does not know that the information he is providing is false," *Pinette*, 52 F.3d at 410, *and* when such ignorance was reasonable.  *See Shipley*, 333 F.3d at 905; *Corn*, 1998 WL 51783, at *5.  Here, however, McKinney's ignorance about the facts of his 2016 hospitalization was not reasonable.  Multiple people—at the very least, the walk-in clinic physician, the first hospital's admitting physician, the subsequent attending physician, a physician and nurse from the second hospital, and McKinney's partner—reported that McKinney experienced confusion and speech disruption during that hospitalization.  *See generally* AR at 329–33.  Such prominently observed and well-documented symptoms are not so "slight and temporary" in character as to have reasonably been forgotten when McKinney applied for insurance coverage.  *See State Bank & Trust Co.*, 145 A. at 567; *Principal Nat'l Life Ins. Co. v. Coassin*, No. 3:13cv1520 (JBA), 2015 WL 5680320, at *5 (D. Conn. Sept. 25, 2015).  Indeed, when questioned in the course of his claim for benefits, he acknowledged that he was first diagnosed with these problems in February of 2016.  The idea that he did not know about them when he applied for the insurance policy in 2017 therefore strains credulity.

To the extent he has no firsthand memory of those symptoms, such memory loss would implicate McKinney's "obligation to make sure that he was answering all of the questions [on the

application for insurance coverage] correctly." *Corn*, 1998 WL 51783, at *5.  By failing to review his own medical records or otherwise investigate whether he had been treated for confusion and speech disruption during the relevant time period, McKinney failed to "use reasonable diligence" when completing his application for insurance coverage.  *See Pinette*, 52 F.3d at 410 (quoting *Ryan v. World Mut. Life Ins. Co.*, 41 Conn. 168, 172 (1874)); *Corn*, 1998 WL 51783, at *5 ("the insured must, in good faith, answer all the questions in the application correctly, and use reasonable diligence to see that the answers are correct").

At least two courts have found an insured's ignorance as to the contents of their medical records unjustified.  In *Shipley*, the Eighth Circuit permitted the insurer to rescind an insurance policy where the insured failed to disclose on his application for coverage that he had previously received certain treatments for several later-diagnosed medical conditions.  *Shipley*, 333 F.3d at 900.  Applying the more deferential standard of review of abuse of discretion, the court upheld the insurer's conclusion that the insured "was not justified in believing his answers to be true," given the undisputed evidence contained in the insured's medical records.  *Id.* at 905.  In *Corn*, another court in this district found the insured's claim of innocent misrepresentation "unavailing" given that the insured's medical records revealed several prescriptions during the relevant time period, despite the insured's contrary representation on his application for coverage.  *Corn*, 1998 WL 51783, at *5.  The court reasoned that the insured "was under an obligation to make sure that he was answering all of the questions correctly. Given the breadth of the question at issue, [the insured] should have realized that his treatment may have had an impact on the coverage under the

13

policy." *Id.*[3]   Applying similar reasoning, another court in this district rejected an insured's argument that his misrepresentation was innocent because, when completing the application for professional liability insurance, he was in a "fog" due to his drug and alcohol addiction. *Mt. Airy Ins. Co. v. Millstein*, 928 F. Supp. 171, 176 (D. Conn. 1996).   The court reasoned that, "[e]ven if [the insured] were in a 'fog,' he still had knowledge from which he could determine that his representations were clearly false.   He should have known his answer was false.   An applicant must use reasonable diligence in ensuring that the answers are correct." *Id.*

Likewise, McKinney had medical records from which he could have determined that his answers to questions 6 and 8 were false, and he had an obligation to use reasonable diligence to ensure that he answered those questions correctly.   This is not a circumstance, as in *Middlesex Mutual Assurance Co.*, in which the insured had no reason to know the falsity of his answers because such facts were justifiably beyond the scope of his knowledge.   218 Conn. at 698 (finding no indication that the insured "knew or had reason to know" that an adult resident of his household had suffered a suspension of his driver's license, in contradiction to the insured's representation on his application for automobile insurance).   Rather, the facts of McKinney's symptoms and treatment while hospitalized were personal to him, reported to medical professionals by his partner, well documented in his medical records, and reasonably implicated by the scope of questions 6 and 8.   Accordingly, his untrue responses to those questions were knowing.

---

[3] McKinney disputes the applicability of *Shipley* and *Corn*, contending that the questions on the respective insurance coverage applications in those cases were broader in scope and, unlike questions 6 and 8 here, would have reasonably implicated the insured's medical conditions.   However, McKinney's argument focuses on his ultimate cancer diagnosis, of which his confusion and speech disruption were symptoms.   The language of questions 6 and 8, asking if the applicant had sought treatment or been treated for confusion, memory loss, or speech disruption, is broad enough to implicate his symptoms of confusion and speech disruption, irrespective of the specific medical condition associated with those symptoms.   Thus, like in *Shipley* and *Corn*, questions 6 and 8 reasonably implicated the treatment McKinney sought during his 2016 hospitalization but omitted from his application for coverage.

Turning to the third element, there is no genuine dispute that McKinney's untrue answers to questions 6 and 8 were material to Provident Life's issuance of the policy.  Courts have repeatedly explained that certain information requested by the insurer and provided by the applicant for insurance coverage is presumptively material.  Importantly, "[i]nformation in an insurance application that becomes a part of the policy is material." *Mt. Airy Ins. Co.*, 928 F. Supp. at 176 (citations omitted).  *Accord Paul Revere Life Ins. Co. v. Pastena*, 52 Conn. App. 318, 323, *cert. denied*, 248 Conn. 917 (1999); *Continental Cas. Co. v. Bank of S.E. Conn.*, No. 2:91CV326 (PCD), 1995 WL 871829, at *1 (D. Conn. June 22, 1995).  Similarly, "[m]atters made the subject of special inquiry are deemed conclusively material."  *State Bank & Trust Co.*, 145 A. at 566.  *See also Shipley*, 333 F.3d at 905–06 ("Furthermore, the fact that the questions were contained in an application form that clearly limited coverage for preexisting conditions indicates that [the plaintiff's] answers to those questions were relevant for determining the extent of his coverage and his premium amounts."); *Pinette*, 52 F.3d at 411 ("Furthermore, Connecticut caselaw strongly suggests that an answer to a question on an insurance application is presumptively material.").  With respect to a life or health insurance policy, a misrepresentation regarding the applicant's prior medical history is generally "material to the risk as a matter of law, and, when knowingly made, will defeat recovery by the insured[.]"  *Lazar v. Metropolitan Life Ins. Co.*, 290 F. Supp. 179, 180 (D. Conn. 1968).

Here, McKinney's knowing misrepresentations were material to Provident Life's issuance of the policy.  Importantly, in signing the application for insurance coverage, McKinney agreed that he understood his answers to the questions would "become part of [his] application and any policies issued on it."  AR at 74.  Accordingly, McKinney was well informed that his answers to questions 6 and 8 would become part of the insurance policy he received and thus were material

to Provident Life's issuance of the policy.  *E.g.*, *Mt. Airy Ins. Co.*, 928 F. Supp. at 176.  In addition,

the questions on the application form, including questions 6 and 8, were clearly intended to limit

coverage, so the application's particular inquiry into the applicant's prior treatment for memory

loss, confusion, or speech disruption renders those questions presumptively material.  *See Shipley*,

333 F.3d at 905–06.  Moreover, the materiality of questions 6 and 8 is consistent with the nature

of the insurance policy at issue, given that a health or life insurance applicant's prior medical

history will necessarily influence the insurer's acceptance of the risk at the particular premium.

*See* 6 Couch on Ins. § 82:13 (3d ed.); *Pinette*, 52 F.3d at 411.

McKinney contends, however, that the record establishes the materiality of questions 6 and

8 only as to the catastrophic and long-term care coverages.  Specifically, the application form

directs applicants to answer questions 6 and 8 "*if applying for*" the catastrophic and long-term care

coverages.  AR at 73 (emphasis added).  Because McKinney claims disability benefits pursuant to

the basic disability benefits coverage, and not the catastrophic or long-term care coverages, he

contends that his answers to questions 6 and 8 could not have been material to Provident Life's

issuance of the basic disability benefits coverage.  For support, he references the underwriter's

representation that, if McKinney had answered "yes" to questions 6 and 8 and "provided details of

[s]hort term memory loss and speech issues," she would have removed the catastrophic coverage

and long-term care coverage.  *Id.* at 1487.  She did *not* indicate whether she would have

nevertheless issued the basic disability benefits coverage.

However, the Court is not convinced that the distinction between coverages warrants

judgment in McKinney's favor.  Initially, as explained, "an answer to a question on an insurance

application is presumptively material."  *Pinette*, 52 F.3d at 411 (citing *State Bank & Trust Co.*,

145 A. at 566).  In addition, the Second Circuit has twice rejected reasoning similar to McKinney's

16

argument.  In *JMR Electronics Corp.*, an insurer issued a policy insuring the life of a corporation's

president at the discounted premium rate available to non-smokers.  *Mut. Ben. Life Ins. Co. v. JMR*

*Electronics Corp.*, 848 F.2d 30, 31 (2d Cir. 1988) (per curiam).  When the insurer sought to rescind

the policy on the ground that the insured was in fact a smoker, the corporation urged the court to

enforce the policy but limit its recovery to "the amount that the premium actually paid would have

purchased for a smoker."  *Id.* at 32.  The court, applying New York law, rejected this argument,

reasoning that "[t]he purpose of the materiality inquiry is not to permit the [factfinder] to rewrite

the terms of the insurance agreement to conform to the newly disclosed facts[.]"  *Id.* at 34.  Rather,

the materiality element ensures "that the risk insured was the risk covered by the policy agreed

upon."  *Id.*  The Second Circuit held that, "[i]f a fact is material to the risk, the insurer may avoid

liability under a policy if that fact was misrepresented in an application for that policy *whether or*

*not* the parties might have agreed to some other contractual arrangement had the critical fact been

disclosed."  *Id.* (emphasis added).

The court applied this reasoning in *Jackson*, 113 F.3d at 368, a case where the insurer

provided various levels of coverage for which an applicant could apply and represented that

applicants would obtain the lowest coverage level as a guaranteed benefit, without regard to the

applicant's medical history.  *Jackson*, 113 F.3d at 368.  The insured applied for and obtained a

higher level of coverage; the insurer, however, subsequently demonstrated that the insured

materially misrepresented his medical history, warranting rescission under ERISA.  *Id.* at 369–70.

The insured argued that he was nevertheless entitled to the guaranteed minimum benefit because

"his misrepresentations regarding [his medical history] were irrelevant to his right to the minimum

payment."  *Id.* at 370.  The court rejected this argument, applying the reasoning of *JMR Electronics*

*Corp.* and explaining that "denying the lower benefits the insured could have obtained without

17

making the misrepresentations would serve the important public policy of discouraging misrepresentation in insurance applications." *Id.* at 372.

The Court finds *JMR Electronics Corp.* and *Jackson* instructive here. Regardless of whether Provident Life might have issued a basic disability benefits policy to McKinney had it known the facts of his 2016 hospitalization, it is undeniable that the true risk in insuring McKinney was not presented to Provident Life in the application or agreed upon by the parties in the insurance policy. It is not the role of this Court to "rewrite the terms of the insurance agreement to conform to the newly disclosed facts[.]" *JMR Electronics Corp.*, 848 F.2d at 34. Given the strong weight of authority establishing the materiality of an applicant's prior medical history subject to specific inquiry, as well as the fact that McKinney's answers were incorporated into the policy issued, the Court concludes that his knowing misrepresentations to questions 6 and 8 were material. Thus, Provident Life is entitled to rescission of the insurance policy as a matter of law.

### B. Question 3(a)

#### 1. Additional Factual Background

Although Provident Life is entitled to rescission of the insurance policy due to McKinney's material misrepresentations in answering questions 6 and 8 of the application, the Court also proceeds to consider whether McKinney materially misrepresented his response to question 3(a). The following additional factual background is relevant to consideration of question 3(a). On May 24, 2017, McKinney took one day of scheduled personal time off ("PTO") from work to attend a three-hour appointment at Yale's Smilow Cancer Center. Def.'s LR 56(a)2 St., ECF No. 58 ¶ 36; AR at 1682. The appointment was scheduled to perform a lumbar puncture, during which a physician attempted to draw spinal fluid to evaluate McKinney's neurosyphilis condition, with

which he had been diagnosed subsequent to his hospitalization in February of 2016.  AR at 1682. The procedure was ultimately unsuccessful that day.  *Id.*

In June of 2017, the application for insurance coverage required an applicant for any of the three types of coverage to answer question 3(a), which asked: "For the period of time commencing 180 days prior to, and including, the date of this application: Due to your sickness or injury, including the common cold and flu, have You missed 1 or more days of work, been confined to your home for 5 or more consecutive days or been admitted to a medical facility?"  *Id.* at 73. McKinney answered "no" to this question.  *Id.*

In investigating McKinney's subsequent claim for basic disability benefits, Provident Life's claims specialist was informed by McKinney's employer that he had taken the PTO day on May 24, 2017, within 180 days of his application for insurance coverage.[4]  Def.'s LR 56(a)(2) Statement, ECF No. 58 ¶ 36.  The claims specialist again consulted Fagan, the underwriter, who explained that she would have obtained the reason for each day of work missed.  AR at 1487. Provident Life obtained McKinney's medical records from the appointment on May 24, 2017, and sent those records to another underwriter, Jason Fairbrother.  He responded that, "had we known [McKinney] missed a day of work for a scheduled medical procedure on Wednesday, May 27, 2017, specifically for a Lumbar Puncture to draw spinal fluid to evaluate his neurosyphilis disease, we would not have issued" the basic disability benefits coverage.  AR at 1726.  Thereafter, the claims specialist concluded that his answer to question 3(a) was untruthful, further justifying denial of his claim for benefits and rescission of his policy.

---

[4] McKinney's employer informed Provident Life that McKinney had taken eight PTO days, including on May 24, 2017, during the 180 days prior to his application for supplemental disability insurance.  Def.'s LR 56(a)2 St., ECF No. 58 ¶ 36.  The other seven PTO days pertained to personal vacations and non-medical time off work, and therefore are irrelevant to the present action.  AR at 1752.

*2. Discussion*

The Court finds no genuine dispute of fact that McKinney made material misrepresentations in responding to question 3(a) of his application for supplemental insurance coverage.  First, there is no dispute that McKinney's answer to that question was untrue.  His representation that he had not missed one day of work due to a sickness or injury in the relevant time frame apparently contradicted his employer's records of his scheduled PTO day and the medical record of his lumbar puncture procedure scheduled on the same date.  Construing the question "as a lay person would understand it," *Middlesex Mut. Assur. Co.*, 218 Conn. at 694, McKinney undoubtedly underwent the lumbar procedure *due to* his neurosyphilis condition, which falls within the broad category of "sickness or injury" implicated by the question.

McKinney contends that the mere fact that he took a PTO day on May 24, 2017, does not establish that "he was *unable* to perform his job duties on that day."  ECF No. 52 at 16 (emphasis added).  To the contrary, McKinney contends that he worked on the day of the appointment, confirmed by the physician's note from the appointment reporting that he "continues to work full time and doing is [sic] very well overall."  AR at 1671, 1745.  However, the Court is not persuaded that this argument should carry the day.  The question did not ask whether McKinney was *unable* to work on any single day due to a medical condition; it asked whether he *missed* work on any single day due to a medical condition.  A scheduled PTO day, during which the employee is not obligated to work, is undoubtedly a day of work "missed" as contemplated by the "clear, everyday language" of question 3(a), regardless of whether the employee chose to perform work on that day anyway.  *See Jackson*, 113 F.3d at 370.  Here, there is no genuine dispute that McKinney took a PTO day on May 24, 2017, in order to undergo a lumbar puncture procedure in treatment of his medical condition.  Accordingly, his representation that he had not missed a single day of work

due to sickness or injury in response to question 3(a) was untrue.  Moreover, at oral argument on the present motion, McKinney conceded that he knew he took the PTO day at issue when completing the application for insurance coverage.  Accordingly, McKinney's misrepresentation as to question 3(a) was undoubtedly knowing.

Finally, ample authority establishes the materiality of McKinney's misrepresentation as to question 3(a).  As with questions 6 and 8, McKinney's response to question 3(a) became part of the policy and is therefore presumptively material.  AR at 74; *Mt. Airy Ins. Co.*, 928 F. Supp. at 176; *Paul Revere Life Ins. Co.*, 52 Conn. App. at 323.  In addition, McKinney's misrepresentation is logically "material to a reasonable insurance company's decision whether to insure that applicant or determination of the premium."  *Pinette*, 52 F.3d at 411; *see also Lazar*, 290 F. Supp. at 180. Moreover, Provident Life's underwriter unambiguously represented that, had he known that McKinney took one PTO day to attend a lumbar puncture appointment regarding his neurosyphilis condition, he would not have issued even the basic disability benefits policy to McKinney.  AR at 1726.  The Court is entitled to rely on an insurer's underwriter's representation regarding the materiality of a misrepresentation.  *Pinette*, 52 F.3d at 411; *Corn*, 1998 WL 51783, at *5.

McKinney cites Provident Life's underwriting guidelines to support his contention that any misrepresentation in response to question 3(a) was not material.  Specifically, he contends that a truthful answer to question 3(a) would have triggered an investigation pursuant to the underwriting guidelines to determine whether McKinney satisfied the substantive eligibility criteria.  The underwriting guidelines provide that "all applicants who meet the 'Active at Work' [requirement] as of the effective date of coverage are eligible for" the basic disability benefits policy under which McKinney filed his claim.  ECF No. 52 at 27.  The "Active at Work" requirement is defined as: "For the period of time commencing 180 days prior to and including the date of application,

applicants must have been *able* to work full-time (30 hours or more per week), performing all the duties of their occupation without limitations due to injury or sickness, and not been homebound or hospitalized due to significant injury or sickness." *Id.* at 25 (emphasis added).  The guidelines identify question 3(a) as relevant to assess the Active at Work requirement.  *Id.*  McKinney further contends that, despite his PTO day on May 24, 2017, nothing in the administrative record indicates that he was *unable* to work full time during the relevant time period, evidenced by his representation that he in fact worked on that PTO day.  Thus, McKinney maintains that, contrary to the underwriter's representation, he would have been eligible for the basic disability benefits based on the underwriting guidelines, and thus his misrepresentation was not material.

The Court cannot find in McKinney's favor on this issue.  As with respect to questions 6 and 8, McKinney cites no authority permitting the Court to excise the coverage he obtained by virtue of his misrepresentation and afford him what coverage remains.  Rather, the materiality inquiry asks whether knowledge of the misrepresentation would "influence the parties in making the contract."  *State Bank & Trust Co.*, 145 A. at 566.  While "[m]ost risks are insurable" at a certain price or under certain terms, *Mut. Ben. Life Ins. Co.*, 848 F.2d at 34, McKinney's misrepresentation permits rescission of the policy because Provident Life has shown, through the consistent evidence of its underwriting guidelines and its underwriter, that "it would have treated [McKinney's] application for insurance benefits differently had it known about his medical history," namely, by obtaining McKinney's medical records, investigating his application, and, ultimately, denying even the basic disability benefits.  *See Shipley*, 333 F.3d at 905; ECF No. 52 at 27.  To the extent the underwriting guidelines and the underwriter's representation appear to differ as to the result of that investigation, the Court need not resolve such factual dispute.  Even if Provident Life issued McKinney some variation of an insurance policy following that

investigation, the decision would have no doubt been influenced to some degree by the facts obtained from his medical records, which means the answer to question 3(a) was material. Rescission of the current policy is justified as a matter of law.

## IV.     CONCLUSION

For the reasons described above, McKinney's material misrepresentations in response to questions 3(a), 6, and 8 establish that Provident Life is entitled to rescission of the insurance policy as an equitable remedy pursuant to ERISA.  Accordingly, Provident Life's motion for summary judgment, ECF No. 53, is GRANTED, and McKinney's motion for summary judgment, ECF No. 51, is DENIED.

**SO ORDERED** at Hartford, Connecticut, this 9th day of September, 2022.


   */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE